**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| LENNON TYLER<br>Plaintiff,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Case No: 1:26-cv-442<br><br>CIVIL ACTION<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Dr. Lennon Tyler ("Dr. Tyler"), by and through undersigned counsel, and for her Complaint against Defendant the United States of America states as follows:

## INTRODUCTION

1. This action arises from the several hours-long unlawful restraint and detention of U.S. citizen, Dr. Tyler, by United States Customs and Border Protection ("CBP") agents at the San Ysidro Border Crossing.

2. Dr. Tyler was returning home from a brief trip to Mexico alongside her fiancé, Lucas Sielaff ("Mr. Sielaff"), where she obtained lifesaving surgery for her dog who had been diagnosed with cancer.

3. Upon their arrival at the San Ysidro Border Crossing, however, CBP agents baselessly targeted Mr. Sielaff interrogating and ultimately detaining him. Mr. Sielaff is a German citizen and was in the United States with a tourist visa.

4. CBP officers were well aware that Dr. Tyler is a U.S. citizen and asked her to continue her journey home. However, when Dr. Tyler asked the CBP officers questions regarding her fiancé's detention, they placed her in handcuffs, searched her body, took her

fingerprints, told her that she had no right to a lawyer, and brought her into a building with dozens of other detainees where they put a cuff around her ankle and restraint her tightly onto a metal bench.

5. Dr. Tyler was restraint to this metal bench, unable to move her legs for several hours until she began to experience high blood pressure and sickness. She asked for her medication which CBP officers denied her.

6. After her health condition worsened, CBP officers finally released her and told her to leave or they would put her dog in a cage, impound her vehicle and arrest her.

7. Dr. Tyler reluctantly left and found her dog in her vehicle, in distress and with his sutures chewed out, requiring further medical treatment.

8. CBP's unlawful detention caused Dr. Tyler to suffer loss of liberty, significant humiliation, fear, trauma, stress, disruption, emotional distress, economic loss and other damages.

9. Dr. Tyler brings this action under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b) and 2671-2680, to vindicate her rights.

## JURISDICTION AND VENUE

10. This action arises under the Constitution and laws of the United States, including the FTCA. This Court has jurisdiction over the subject matter of this complaint, pursuant to 28 U.S.C. §§ 1331 (federal question statute) and 1346(b) (United States as a defendant).

11. Venue in the U.S. District for the District of Columbia is proper. The office for the CBP's headquarters is located in the District of Columbia.

## EXHAUSTION

12. Pursuant to 28 U.S.C. § 1675(a), Dr. Tyler submitted an administrative tort claim to CBP on May 5, 2025. A redacted copy of Dr. Tyler's administrative claim is attached hereto as **Exhibit 1**. A copy of the government's receipt of of the claim is attached as **Exhibit 2**.

13. CBP failed to issue a final disposition within the required six-month period; such failure is considered a denial of the claim. 28 U.S.C. § 2675(a). Dr. Tyler has thus exhausted all available administrative remedies and is filing this complaint in accordance with the FTCA.

## PARTIES

14. Plaintiff, Dr. Lennon Tyler, is a resident of Las Vegas, Nevada, and a U.S. citizen. She is a licensed psychologist.

15. Defendant United States of America is the appropriate defendant for claims brought pursuant to the FTCA. 28 U.S.C. § 1346(b).

## FACTS

16. On February 14, 2025, Dr. Tyler and Mr. Sielaff drove from Las Vegas to Mexico with her vehicle to obtain lifesaving surgery for her dog who had been diagnosed with cancer.

17. Mr. Sielaff is a German citizen who resides in Germany and was visiting Dr. Tyler in Las Vegas at the time of their trip to Mexico.

18. On February 18, 2025, they returned to the United States from Mexico with her vehicle. Dr. Tyler was driving the vehicle.

19. At the San Ysidro Border Crossing, in California, they encountered a CBP officer.

20. The CBP officer requested to see their passports which they handed to him.

21. As soon as the CBP officer saw Mr. Sielaff's German passport, he became agitated and began to yell at them.

22. The CBP officer asked where Mr. Sielaff lived to which he responded Las Vegas. Due to his language barrier, Mr. Sielaff did not understand the question and believed he was asked where in the United States he was staying during his visit. Dr. Tyler attempted to explain the misunderstanding, but the CBP officer simply waived them through to secondary inspection and told them that he did not "want to deal with [them]".

23. Mr. Sielaff had travelled to the United States from Australia, on January 27, 2025, as reflected by his Electronic System for Travel Authorization visa. He has never resided in the United States.

24. Once they crossed the border in Dr. Tyler's vehicle, they were stopped by two other CBP officers who told them that they needed to search their vehicle. During their search they discovered medication which Dr. Tyler had purchased in Mexico for her personal use. The CBP officers seized the medication "for failing to declare merchandize".

25. The medication Dr. Tyler purchased in Mexico was Tizanadine and Zolpidem. Tizanadine is sold over the counter in Mexico, and she saw a doctor in Mexico who prescribed Zolpidem to her.

26. Dr. Tyler had previously been diagnosed with insomnia and a chronic bladder condition for which she was required to undergo surgery twice a year for the past four years. She takes Tizanadine and Zolpidem to treat these conditions.

27. While CBP officers searched Dr. Tyler's vehicle one of the CBP officers handcuffed and detained Mr. Sielaff and took him to a nearby building.

28. The other CBP officer handed Dr. Tyler her passport and told her to leave. She then asked the officer what was happening to her fiancé and why they detained him. The CBP

officer did not answer her questions. She, therefore, asked to speak to a supervisor whereupon the CBP officer left without responding.

29. Dr. Tyler sat in her vehicle and waited for approximately two minutes when two CBP officers approached her vehicle. They told her to "step outside of the car". Dr. Tyler felt intimidated and vulnerable and complied with their request.

30. After she exited her vehicle, Dr. Tyler was placed in handcuffs. She asked the CBP officers "am I being arrested?" and one of the officers responded with "no, you are being detained".

31. Subsequently, the two CBP officers grabbed Dr. Tyler's arms on each side and escorted her into a separate building nearby. Dr. Tyler was separated from her dog who had remained in the vehicle alongside her necessary medication.

32. Inside the building, CBP officers removed Dr. Tyler's handcuffs and told her to place her hands on a table in front of her. They then called for a female CBP officer to come into the room who proceeded to pat her down. There were at least five CBP officers in the room with her when the female officer aggressively pulled a hair tie out of her hair, opened her mouth and searched her entire body, including her breasts, her groin, and her buttocks. Dr. Tyler felt extremely distressed and violated by this search.

33. CBP officers then took Dr. Tyler to a fingerprint scanner. At this time, she again requested to speak with a supervisor and a lawyer and refused to submit her biometrics for fingerprinting.

34. The CBP officers told her that she had no right to a lawyer and that she had no choice but to submit her biometrics because "[I] gave [my] consent when I crossed the border". Reluctantly, Dr. Tyler complied.

35. However, Dr. Tyler continued to ask for clarification regarding her detention. They continued to ignore her requests and repeatedly told her that she has “no rights” and to “shut up”.

36. CBP officers then took Dr. Tyler to a metal bench and told her to put her hands on the wall and lift her right leg when they put an ankle cuff with a chain on her ankle. They then pulled the chain tightly onto the metal bench such that she was not able to move or even cross her legs.

37. Dr. Tyler protested that her dog who had just had surgery was still in the vehicle and alone and should not be unattended. The CBP officers ignored her pleas and continued to tell her to “shut up”.

38. After some time and continued pleas for help with her dog, one CBP officer escorted Dr. Tyler back to her vehicle and allowed her to put an electronic collar on her dog. She noticed that her dog was anxious and had already chewed several of his sutures out. Dr. Tyler was distressed and continued to plead with the CBP officer regarding her concerns for her dog. He ignored Dr. Tyler, however, and escorted her back into the building and chained her ankle to the same metal bench.

39. A few hours later, Dr. Tyler began experiencing high blood pressure and sickness. She explained to the CBP officers that she had medical conditions and that she needed medication. The CBP officers said that she could not have her medication and that access to medication was “denied during detention”.

40. Approximately 15 minutes later, Dr. Tyler’s health condition continued to worsen and she requested to be transferred to medical care.

41. Eventually, two CBP officers unlocked the chain and her handcuffs and took Dr. Tyler back to the table where they presented her with a Notice of Penalty and Demand for Payment and told her to sign it. She refused to sign it and, once again, asked to speak with a supervisor. The CBP officers then threatened to put her dog in a cage, impound her vehicle and arrest her if she did not leave.

42. Dr. Tyler was scared for her fiancé, her dog, and herself and decided to leave to attend to her dog. When she returned to her vehicle, her dog was still inside, in distress, and had chewed all of his sutures out. As a consequence, her dog was required to undergo further medical treatment in Las Vegas.

43. Dr. Tyler later learned that her fiancé was transferred to the Otay Mesa Detention Center in San Diego, California, where he remained until March 5, 2025. On that day, he was deported to Germany.

44. Dr. Tyler felt emotionally distressed and traumatized by the unlawful detention and the inhumane treatment she experienced and continues to experience anxiety as a result of the CBP officers' actions.

## COUNT I

### Federal Tort Claims Act – False Arrest

45. Paragraphs 1 through 44 are incorporated herein by reference as if fully restated.

46. The tort of false arrest is committed when a plaintiff demonstrates the defendant's "unlawful violation of a person's right of personal liberty or the restraint of that person without legal authority."

47. CBP agents restrained and interfered with Dr. Tyler's liberty of movement when she was forced to exit her vehicle and escorted into a building.

48. CBP agents used displays of force and authority to ensure that Dr. Tyler did not feel free to leave, unreasonably searched her body and detained her for several hours, tightly chained to a metal bench. The agents did so without a warrant, probable cause, or reasonable suspicion to believe that Dr. Tyler had or was committing a criminal offense.

49. CBP restrained and detained Dr. Tyler for unlawful reasons, merely because she asked questions regarding her fiancé's detention. There is no state or federal law which permits the seizure or restraint of a person's movement for this reason.

50. Dr. Tyler suffered harm, including, but not limited to, loss of liberty, significant humiliation, fear, trauma, stress, disruption, emotional distress, economic loss, and other damages.

51. Defendant United States of America is liable for these acts and omissions under the FTCA.

## COUNT II

### Federal Tort Claims Act – False Imprisonment

52. Paragraphs 1 through 51 are incorporated herein by reference as if fully restated.

53. A false imprisonment claim involves similar elements as those required to establish a false arrest.

54. CBP agents restrained and interfered with Dr. Tyler's liberty of movement when she was forced to exit her vehicle and escorted into a building.

55. CBP agents used displays of force and authority to ensure that Dr. Tyler did not feel free to leave, unreasonably searched her body and detained her for several hours, tightly chained to a metal bench. The agents did so without a warrant, probable cause, or reasonable suspicion to believe that Dr. Tyler had or was committing a criminal offense.

56. CBP restrained and detained Dr. Tyler for unlawful reasons, merely because she asked questions regarding her fiancé's detention. There is no state or federal law which permits the seizure or restraint of a person's movement for this reason.

57. Dr. Tyler suffered harm, including, but not limited to, loss of liberty, significant humiliation, fear, trauma, stress, disruption, emotional distress, economic loss, and other damages.

58. Defendant United States of America is liable for these acts and omissions under the FTCA.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, Dr. Lennon Tyler, respectfully requests judgment as follows:

A. Trial by jury on all claims so triable.

B. Compensatory damages in an amount to be proven at trial.

C. Costs and reasonable attorneys' fees.

D. Such other relief as the Court deems just and equitable.

Dated: February 12, 2026

Respectfully Submitted,

*_/s/ Dennis E. Boyle_*
Dennis E. Boyle, Esquire
Boyle & Jasari LLP
1050 Connecticut Ave, NW
Suite 500
Washington, D.C. 20036
Telephone: (771) 217-2400
Email: dboyle@boylejasari.com

*Counsel for Plaintiff*